**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| P.M.W., | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 5:21-cv-00301-CHW** |
| | : | |
| COMMISSIONER | : | |
| OF SOCIAL SECURITY, | : | **Social Security Appeal** |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>ORDER</u>

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff P.M.W.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision and there were no errors in how the ALJ handled Plaintiff's case, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for Title II and Title XVI disability benefits on August 23, 2019, alleging disability beginning on September 1, 2018, due to a "nervous breakdown." (Exs. 1A, 2A). Her date last insured (DLI) was December 31, 2022. (R. 71, 82). After Plaintiff's applications were denied initially and on reconsideration at the state agency level of review (Exs. 1A, 2A, 5A, 6A), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a telephonic hearing on October 20, 2020. (R. 40-70). The ALJ issued an unfavorable opinion

on February 10, 2021. (R. 7-34). Plaintiff's request for review of that decision by the Appeals Council was denied on June 24, 2021. (R. 1-6). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment,

whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

Plaintiff has treated with primary care physician Dr. Callins and nurse practitioners (NP) Sanders-Miller[1] and Weekley at Community Health Systems since November 2016. The records of this treatment detail medical issues mostly relating to blood pressure and heavy menstrual bleeding but also note Plaintiff's mental health symptoms. (Exs. 5F, 8F). On August 27, 2018, Plaintiff saw NP Weekley for blood pressure medication refills after being without any medication for about three months. (R. 516). The records of this visit do not show any concerns about Plaintiff's mental health. (R. 516-517). The same was true for appointments on August 28 and August 30, 2018. (R. 512, 514-515).

Later on August 30, 2018, Plaintiff went to the emergency room (ER) at Fairview Park Hospital after feeling lightheaded and having difficulty swallowing. (R. 667, 676). Plaintiff attributed these symptoms to starting new blood pressure medication. (R. 676). Plaintiff also reported some visual hallucinations, but no significant psychiatric history was noted. (*Id.*) Her ear was cleared of a blockage, and she was discharged home. (R. 668-669, 680). Plaintiff returned to the ER later the same day for complications of high blood pressure. (R. 643). At this visit, Plaintiff said that she started feeling dizzy about three weeks prior and also reported nervousness after hearing voices. (R. 645, 650). Plaintiff admitted she had not taken her blood pressure medication.

---

[1] Community Health Center's NP Diana Miller and NP Diana Sanders appear to be the same provider. The ALJ's used both names or just "Sanders" when discussing the records. For clarity, the Court has used both names in the medical record summary.

(R. 650). An ECG showed a possible left atrial enlargement. (R. 655, 658). Plaintiff's CT scan showed no acute intracranial abnormality. (R. 660). Plaintiff was stabilized and discharged home a few hours later. (R. 656).

Plaintiff began treating with Dr. Lauterbach, a psychiatrist, and his staff at Community Mental Health Center, where she had a biospsychosocial exam on September 7, 2018, after being under significant stress. (R. 441). Before her next appointment with Dr. Lauterbach, she returned to Community Health. Plaintiff saw NP Weekley on September 14, 2018, to request new blood pressure medication after one dose of a newer medication made Plaintiff dizzy, sleepy, and nervous. (R. 508). She also reported her previous ER visit for similar symptoms. (*Id*.) Plaintiff's mother said that before Plaintiff's August appointments at Community Health, Plaintiff had not taken any blood pressure medications for 3 months. (*Id*.) At the appointment, NP Weekley noted Plaintiff had appropriate mood and affect, good eye contact, and normal speech. (R. 509).

Plaintiff followed-up with NP Sanders-Miller on September 17, 2018, and reported hearing voices, feeling nervous, and being unable to sleep. (R. 505). Plaintiff again reported side effects from a new blood pressure medication, but she had not taken it prior to this appointment. (R. 505-506). She did not report improved symptoms following an ER visit. (R. 505). Observing Plaintiff's condition, Dr. Owens and NP Sanders-Miller scheduled Plaintiff to be seen the same day at Community Mental Health ahead of a previously scheduled appointment. (R. 506). The staff there sent Plaintiff to Fairview Park Hospital ER, where Plaintiff also reported issues with her blood pressure, insomnia, and hearing voices. (R. 624, 629). Plaintiff's mother explained that Plaintiff had left home during the night and gone to a neighbor's home. (R. 629). Despite her symptoms, Plaintiff reported no interference with her daily activities. (*Id*). Plaintiff was deemed stable and discharged home. (R. 635).

A few days later, on September 21, 2018, when Plaintiff saw NP Sanders-Miller for a blood pressure check, Plaintiff continued to report hearing voices. (R. 503). Plaintiff's mother stated that Plaintiff seemed "out of it" after taking one Zoloft. (*Id*.) Staff advised Plaintiff's mother to seek emergency treatment if Plaintiff reported that the voices told her to hurt herself or others. (*Id*.)

Plaintiff's mother called an ambulance to take Plaintiff to the ER again on September 23, 2018, after Plaintiff said she was hearing voices and felt like someone was in their home. (R. 610, 617). Once at the ER, Plaintiff admitted a history of auditory hallucinations but described what she was hearing as sounds instead of voices, which made sleep difficult. (R. 617, 619). Plaintiff was again deemed safe to be discharged and was sent home. (R. 619-620). Plaintiff went to the ER again later that day, but this time at Coliseum Medical Center, with complaints of depression and anxiety accompanied by auditory hallucinations. (R. 367-368). Plaintiff had a flat affect but otherwise presented as awake and alert with no acute distress. (R. 370). After being medically cleared, Plaintiff was transferred to an inpatient facility for a psychological evaluation. (R. 374).

Plaintiff was admitted to Ridgeview Institute from Coliseum Hospital for involuntary psychiatric treatment on September 24 through October 3, 2018, to "rule out brief psychotic disorder versus major depressive disorder…with psychotic features." (R. 394-396, 402, 416). Plaintiff reported hearing voices and presented as disorganized, confused, and paranoid, but denied having depression and anxiety. (R. 395). As in the ER, her affect was blunted. (*Id*.) Plaintiff's discharge Axis-I diagnosis was schizoform disorder. (*Id*.) At discharge, Plaintiff was not showing any signs of distress, got along well with peers and staff, and no longer reported hallucinations or delusions. (*Id*.) Treatment providers also added 20mg of Abilify daily to Plaintiff's medications at discharge following previous attempts to use a lower dosage. (*Id*.) Plaintiff was stable at the time of discharge. (R. 395-396).

Plaintiff presented to Fairview Park Hospital ER, late on November 1, 2018, with shortness of breath that had lasted a couple of days. (R. 580, 588). Plaintiff's ECG was unchanged compared to one from August 2018. (R. 596). Notes reflect that Plaintiff was taking Zoloft for depression, but nothing cited concerns regarding Plaintiff's mental health on this visit. *See* (R. 580-602). Plaintiff was discharged home. (R. 601-602). Plaintiff returned to Dr. Lauterbach on November 8, 2018, where Plaintiff reported moderate stress, continued insomnia, and financial issues. (R. 441). Plaintiff displayed an anxious mood but reported no hallucinations. (R. 442). After learning about her hospitalization at Ridgeview, Dr. Lauterbach opined that Plaintiff's symptoms may be an "acute stress reaction" and assessed Plaintiff with brief psychotic disorder. (R. 441). Notes indicate that Plaintiff had impaired function for work and home activities. (*Id.*) Dr. Lauterbach continued Plaintiff's Abilify and added Lorazepam. (R. 442). At the December 2018 follow-up visit, Plaintiff reported less stress but expressed grogginess as a side effect of Abilify. (R. 443-444). Plaintiff's affect was anxious but stable, she was oriented, and her insight and judgment were intact. (R. 442, 444). Dr. Lauterbach adjusted Plaintiff's medications to address Plaintiff's grogginess. (R. 444). Notes indicated that Plaintiff planned to return to work. (*Id.*)

Plaintiff visited Fairview Park Hospital ER in January 2019 for heavy vaginal bleeding and cramping. (R. 562). Plaintiff reporting having fibroid surgery scheduled later in the month. (R. 572). She was stabilized and discharged home. (R. 576). Her next visit to Dr. Lauterbach in January 2019 noted her planned fibroid surgery and some significant stress. (R. 444-445). Dr. Lauterbach added hydroxyzine to Plaintiff's medications, as needed, and referred her for individual therapy. (R. 445). He also discussed keeping Plaintiff's treatment plan steady for one year before beginning to taper Abilify. (R. 446). In April 2019, Plaintiff continued to have symptoms of anxiety and depression, especially related to restlessness and her inability to work. (R. 446).

Plaintiff continued treating at Community Health during this time. In January 2019, Plaintiff followed up for high blood pressure and also expressed concerns about excessive vaginal bleeding. (R. 499). She was not taking her iron as prescribed but stated she was otherwise compliant with her medications. (*Id*.) She complained of being nervous but had no complaints of hallucinations. (R. 500). At an appointment a week later, Plaintiff again voiced concerns about menstrual bleeding, although she was not bleeding at the appointment. (R.  496). Dr. Callins prescribed an injection of Depo Provera. (R. 497). In early May 2019, Plaintiff saw Dr. Callins with reports of heavy menstrual bleeding and again received an injection of Depo Provera to curtail the bleeding. (R. 493-495). At her a follow-up about a week later, the bleeding had stopped. (R. 490). Plaintiff also stated that she felt that no longer needed to take Abilify and her sleep had improved. (*Id*.) In July 2019, Plaintiff's blood pressure was normal in office. (R. 487). Plaintiff reported feeling better and again stated that she did not need Abilify. (*Id*.) Her vaginal bleeding had been reduced to spotting, and despite some weight gain she was tolerating Depo Provera well. (*Id*.) Plaintiff presented to Dr. Callins in August 2019 after experiencing breakthrough heavy menstrual bleeding for one month. (R. 484). Plaintiff received another injection to control the symptoms. (*Id*.)

Plaintiff next followed-up with Dr. Lauterbach in September 2019, where Plaintiff complained of depressive symptoms but denied any anxiety or psychosis related symptoms. (R. 447). Plaintiff elected to restart her mental health medications after having no problems with not taking it for periods lasting five weeks and two months, respectively. (R. 449). After speaking with Plaintiff, Dr. Lauterbach noted his concerns that Plaintiff potentially had late onset Schizophreniform Disorder. (*Id*.)

On January 21, 2020, at a follow-up visit with NP Carlson, Plaintiff stated that she had not taken her prescribed medications, Abilify, Vistaril, or Lorazepam, for three months since her insurance ran out. (R. 438). Plaintiff rated her depression 5 out of 10, explained that she sometimes hears voices calling her name, and described having trouble sleeping. (*Id.*) Plaintiff's affect was congruent and appropriate, and her speech was coherent. (*Id.*) Overall, NP Carlson found no gross cognitive defects. (R. 439). After reviewing Plaintiff's symptoms and medicine compliance, NP Carlson decided to discontinue Plaintiff's medications and prescribed Remeron, an antidepressant, to address Plaintiff's depression, hallucinations, and sleep issues. (R. 438).

At her next appointment in February 2020, Plaintiff had not been able to fill the Remeron prescription, so NP Carlson gave her some in office. (R. 1037).[2] By her appointments in March and May 2020, Plaintiff reported that her depression was improving, and she had no anxiety since taking the new medication. (*Id.*) During a June 17, 2020 telephonic check-in at Community Mental Health, Plaintiff denied depression, anxiety, or hallucinations, but she reported feeling confused. (*Id.*) Plaintiff's mother stated that Plaintiff was not taking her medications due to keeping her grandkids overnight. (*Id.*) Plaintiff had episodes of paranoia and anxiety. (*Id.*) NP Yancey advised that Plaintiff should be evaluated at the ER and added Seroquel to Plaintiff's nighttime medications. (*Id.*)

Plaintiff was taken by ambulance to Fairview Park Hospital ER on June 22, 2020, complaining of heat coming from her chest and a burning in her throat. (R. 552, 556). At intake, Plaintiff stated that the symptoms had resolved, but she admitted that her family called an ambulance because they thought that she was depressed, anxious, and not taking her medications.

---

[2] Plaintiff's February through September 2020 records from Community Mental Health are found in Exhibit 9F, which has been reviewed by the Court. However, the last summary page, R. 1037, reflecting each visit has been cited.

(R. 556). She denied any depression and anxiety. (R. 552, 556, 559). She was diagnosed with chest discomfort and discharged home. (R. 554). Later the same day, Plaintiff was taken to the Coliseum Hospital ER by ambulance. (R. 1082). Plaintiff's daughter described Plaintiff as "not acting right," and she suspected that Plaintiff was not taking her medication. (R. 1080, 1087) Plaintiff's affect and mood were normal. (R. 1090). A CT scan showed no abnormalities. (R. 1153). Plaintiff requested to be discharged and she was released with a direction to keep her already scheduled psychiatric appointment. (R. 1084-1086, 1093-1094).

When Plaintiff's hallucinations and paranoia continued, Plaintiff's daughter took her to a crisis center to be stabilized, which led to Plaintiff's being involuntarily hospitalized at River Edge Behavioral Health from June 24 through July 4, 2020. (Ex. 7F, R. 1013, 1019). At first, Plaintiff denied these issues at intake, but her family confirmed the symptoms, disclosed her depression and anxiety, and reported that Plaintiff had not been taking her medications. (R. 1019). Plaintiff then admitted having depression, anxiety, and trouble sleeping. (*Id*.) Later Plaintiff disclosed that she believed her mother and brother to be strangers and that she was afraid to return home. (R. 1000). Early in the hospitalization, Plaintiff experienced issues with knowing the time of day, eating, confusion, nervousness, and sleep. *See*, *e.g.*, (R. 973, 977, 980, 988-999). Once an inpatient bed opened, Plaintiff appeared receptive to taking her medications and to treatment. (R. 875). Upon discharge, Plaintiff denied having any hallucinations and reported feeling much better. (R. 830-831).

In July 2020 at Community Mental Health, Plaintiff was compliant with her medicines and reported doing well. (R. 1037). In August 2020, NP Carlson increased the dosage of Plaintiff's medications after she reported hearing voices again and having sleep issues. (*Id*.) In September 2020, Plaintiff was seen in person and denied any issues, including hallucinations, paranoia, or

delusions. (*Id.*) An evaluation done on September 6, 2020, showed otherwise, however, and indicated that Plaintiff had been wandering away from home and "talking out of her head." (*Id.*) Plaintiff denied sleep issues and attributed her latest symptoms to bad dreams. (*Id.*) NP Carlson increased Plaintiff's Seroquel to help her sleep. (*Id.*)

Intermingled with her mental health treatment in the first part of 2020, Plaintiff also saw Dr. Callins and her staff for other medical issues. In January 2020, Plaintiff saw Dr. Callins for a follow-up visit with complaints of headaches, body aches, and being without her blood pressure medications for two weeks. (R. 477). Plaintiff stated her mental health was well controlled on her current medications, and she indicated no symptoms on the depression screening. (*Id.*) Plaintiff received her blood pressure medication at the appointment and counseling about the dangers of uncontrolled blood pressure and running out of medication. (R. 478).

At a follow-up on February 20, 2020, Plaintiff's affect and mood were normal. (R. 1030). Plaintiff next saw Dr. Callins on July 30, 2020, again for complaints of heavy menstrual bleeding. (R. 1027-1029). No issues were noted about Plaintiff's mental health. (*Id.*) Plaintiff had another telehealth follow-up with NP Weekley four days later where Plaintiff disclosed her River Edge hospitalization. (R. 1024).

*Consultative Exam*

Dr. Larmia Robbins-Brinson met with Plaintiff and performed a consultative psychological evaluation on December 30, 2019. (Ex. 3F). Dr. Robbins-Brinson reviewed Plaintiff's records covering January 2018 through September 2019. (R. 434). Plaintiff reported having a nervous condition as the reason for her disability application. (*Id.*) Plaintiff also discussed the events leading up to her 2018 involuntary inpatient hospitalization by explaining that she felt paranoid, had delusions, and believed she had lost her mind. (*Id.*) She also described experiencing extra

stress prior to her hospitalization due to her adult son moving in with her, requiring rides to work, and demanding financial help, while Plaintiff cared for his child. (*Id.*) However, her sleep and stress had improved when her son moved out. (R. 435). Plaintiff showed positive response to the inpatient treatment. (*Id.*)

Plaintiff reported treating with Dr. Lauterbach and having an Abilify prescription, although she had been out of the medication for two weeks. (R. 434). Although her son no longer lived with her, Plaintiff reported that she still cared for her grandson on the weekends and another grandchild on weekdays, while she lived with her mother, who provided financial assistance to Plaintiff. (R. 435). Plaintiff denied "major current severe stress." (*Id.*) Dr. Robbins-Brinson found no issues as to Plaintiff's ability to structure her day, to care for herself, or to complete many chores, errands, or household tasks. (*Id.*)

Dr. Robbins-Brinson noted Plaintiff's pleasant mood and appropriate affect. (*Id.*) She found that Plaintiff was of average intelligence, communicated effectively with normal speech, and had no severe thinking impairments. (R. 435-436). Plaintiff acknowledged feeling fine and experiencing different moods, and she reported no current auditory or visual hallucinations. (R. 435). She displayed good judgment and insight. (R. 436). Overall, Dr. Robbins-Brinson believed Plaintiff to be a good reporter of her symptoms and current functioning abilities. (R. 435-436). Based on her examination, Dr. Robbins-Brinson assessed Plaintiff with brief psychotic disorder, which was in remission. (R. 436). Dr. Robbins-Brinson opined that Plaintiff's prognosis was fair to good, but she voiced concerns that Plaintiff's lack of compliance on her medication would impact her recovery. (*Id.*)

*Hearing Testimony and Function Reports*

Plaintiff was 51 at the time of the hearing before the ALJ. (R. 47). She testified that she lived with her mother. (*Id.*) She described sleeping about five hours per night and being able to care for her personal needs. (R. 52). She explained she does not cook, but sometimes is able to help with laundry or dishes. (R. 52-53). She mostly watches TV during the day. (R. 53). She described her condition as "better," but stated that she sometimes still hears voices at night. (R. 53-54). She stated that her depression left her in a bad mood that sometimes made dealing with others problematic. (R. 54). She first noticed issues with depression and hallucinations in summer 2018 and stated that she quit working because of these issues. (R. 56). She recalled her hospitalizations, including the one resulting from her most recent breakdown in June 2020. (R. 57-59). Plaintiff described problems with memory and concentration, such that her mother makes and keeps up with Plaintiff's appointments. (R. 61-62).

Plaintiff and her mother completed function reports. (Exs. 4E, 5E, 6E, 73, 13E). Plaintiff's mother described Plaintiff's nervous breakdown in September 2018. (R. 258). Plaintiff's mother did not greatly limit Plaintiff's ability to perform chores or take care of herself, except taking her medication, and stated that Plaintiff cares for a grandchild on the weekends. (R. 259-260). She limited Plaintiff's ability to lift, walk, sit, see, remember, stand, talk, complete tasks, use her hands, get along with others, and concentrate. (R. 263). Plaintiff's function reports largely mirrored her hearing testimony (Exs. 6E, 7E, 13E), although she only stated that her conditions affect her ability to see, hear, remember, complete tasks, concentrate, understand, and follow instructions. (R. 279, 322). In her 2020 report, Plaintiff emphasized the effect her anxiety and nervousness have on her sleep and expressed concerns about her ability to handle stress. (R. 323-324).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 1, 2018, the alleged onset date. (R. 12-13). Plaintiff's date last insured was December 31, 2022. (R. 12). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: congestive heart failure, hypertension, schizophrenia, psychotic disorder, anxiety, and major depressive disorder. (R. 13). The ALJ also found that Plaintiff suffered from gastroesophageal reflux disease, vitamin D deficiency, sinusitis, iron deficiency anemia, insomnia, and menorrhagia, but found that these impairments were non-severe. (*Id*.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 13-16). Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work, with the following limitations:

> The claimant is limited to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently. The claimant can frequently climb ramps or stairs. The claimant can frequently balance, stoop, kneel, crouch, or crawling [sic]. The claimant can have no more than occasional contact with the general public and no more than occasional "team-type" interaction with co-workers. The claimant is limited to performing simple routine unskilled tasks that can be learned from short demonstration up to a 1 month time period of training.

(R. 16).

Based on this RFC, the ALJ found at step four that Plaintiff is not capable of performing any past relevant work. (R. 27). Pursuant to step five, the ALJ determined that there are jobs existing which Plaintiff can perform, including production assembler, electronic worker, and hand packager, inspector. (R. 28-29). As a result, the ALJ determined that Plaintiff was not disabled

within the meaning of the Social Security Act at any time from September 1, 2018, through the date of the decision. (R. 29).

## ANALYSIS

Plaintiff argues that the ALJ improperly considered Plaintiff's mental health treating source evidence and thus did not account for those limitations in the RFC. Plaintiff also argues that the ALJ failed to consider whether Plaintiff met a Listing impairment and failed to consider the regional availability of the occupations suggested by the vocational expert. (Doc. 17). Plaintiff's arguments do not support remanding her case to the Commissioner. The ALJ's decision adequately considered Plaintiff's mental health records and explained the findings and conclusions based on the entire record. The decision is therefore supported by substantial evidence.

1. The ALJ appropriately considered Plaintiff's mental health treatment records and the RFC is supported by substantial evidence.

Plaintiff suggests that the decision finding Plaintiff capable of a light work RFC is not supported by substantial evidence because the ALJ improperly considered Plaintiff's mental health treatment records, which led to the ALJ's failure to account accurately for Plaintiff's limitations in the RFC. (Doc. 17, p. 3-8). Plaintiff chiefly argues that the ALJ must give "substantial or considerable weight to the opinions of treating physicians absent 'good cause'" and that the ALJ incorrectly dismissed Plaintiff's description of her mental health symptoms under the pain standard laid out in *Holt v. Sullivan*, 921 F.3d 1221, 1223 (11th Cir. 1991). (*Id*. p. 4-5). However, the rule to which Plaintiff refers, otherwise known as the "treating physician rule," no longer applies. The record further shows that the ALJ evaluated Plaintiff's claim under the correct standards.

For applications filed on or after March 27, 2017, there is no requirement to give treating physicians deference. *See* 20 C.F.R. §§ 404.1520c and 416.920c. Plaintiff filed her application for benefits in August 2019. The weight given to all medical opinion evidence – even those opinions

14

from Plaintiff's own treating physicians – is now governed by 20 C.F.R. §§ 404.1520c and 416.920c. Under these regulations, the agency no longer defers or gives any specific evidentiary weight to any medical opinion, even those from a claimant's own medical sources.  20 C.F.R. §§ 404.1520c(a) and 416.920c(a). The decision instead must articulate how persuasive the medical opinions and prior administrative findings were found to be. 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). The decision is not required to articulate the determination for each and every record, however, and instead may discuss the source of the opinion in a single analysis. 20 C.F.R. §§ 404.1520c(b)(1) and 416.920c(b)(1). The following factors will be used to consider and weigh the record: supportability, consistency, relationship with the claimant, and specialization. 20 C.F.R. §§ 404.1520c(c)(1)-(4) and 416.920c(c)(1)-(4). The most important factors are supportability and consistency, and the decision must state how these factors were considered in the disability determination. 20 C.F.R §§ 404.1520c(b)(2) and 416.920c(b)(2).

The ALJ correctly identified and applied the applicable legal standards, and the decision adequately explains the findings and conclusions. After the ALJ found that Plaintiff had medically determinable impairments which could reasonably be expected to cause her alleged symptoms (R. 18), the ALJ next had to evaluate the intensity and persistence of Plaintiff's symptoms and their effect on her ability to work, by considering the objective medical evidence, the claimant's daily activities, treatment and medications received, and other factors concerning functional limitations and restrictions due to her symptoms. *See* 20 C.F.R. §§ 404.1529 and 416.929. The ALJ found that Plaintiff's descriptions "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record…." (R. 18). The regulations found in 20 C.F.R. §§ 404.1520c and 416.920c, outlined above, govern the consideration of medical opinions in context of this evaluation as there is no longer a

treating physician rule or deference. Additionally, "[i]f the ALJ discredits subjective testimony, [she] must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). The post-March 27, 2017 regulations do not change the requirement that the ALJ explain the factors considered with particularity. Otherwise, "'…it [would be] impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.' [When] the ALJ fails 'to state with at least some measure of clarity the grounds for his decision,' [the Court] will decline to affirm 'simply because some rational might have supported the ALJ's conclusion.'" *Winschel*, 631 F.2d at 1179 (citations omitted).

The ALJ found that Plaintiff's schizophrenia, psychotic disorder, anxiety, and major depressive disorder counted as severe conditions. (R. 13). She acknowledged the records for Plaintiff's mental health treatment, including Dr. Lauterbach's office notes, Plaintiff's ER treatment, and Plaintiff's two involuntary hospitalizations. (R. 18-27). The ALJ was entitled to consider Plaintiff's own participation and compliance in treatment, and correctly surmised that Plaintiff's most recent hospitalization stemmed from not taking her medication. (R. 25). At discharge from this hospitalization and even through the last psychiatric appointments just a few months prior the ALJ's hearing, Plaintiff reported no hallucinations and responded well to treatment when she was compliant with her medications, thus undermining Plaintiff's subjective description of her symptoms.

Plaintiff's mental health records, contrary to Plaintiff's argument, were fairly summarized,[3] and there was no requirement for the ALJ to discuss every single visit. Moreover, the ALJ does

---

[3] There is a harmless error in the ALJ's summary of the medical records, where the ALJ references a possible third inpatient hospitalization in August 2019 but says there are no treatment records from Ridgeview Institute to support treatment. (R. 22). As explained at the hearing, the Ridgeview Institute

not ignore the notes from Community Mental Health or only cite four visits as Plaintiff suggests. *See* (R. 20-24) (reflecting discussion of Dr. Lauterbach and NP Carlson's treatment notes). Instead, the ALJ examined the consistency and supportability of the records by looking the objective findings compared to Plaintiff's subjective symptoms and other treatment during this time frame. *See, e.g.*, (R. 20) (comparing ER staff observations to objective findings and discussing Dr. Lauterbach's following Plaintiff's hospitalization); (R. 22) (recognizing Plaintiff's complaints of depression and anxiety but finding her mental status similar to previous visits in the record).

In her decision, the ALJ did not simply ignore Plaintiff's subjective symptoms and limitations. The ALJ referenced Plaintiff's testimony that she no longer worked due to her impairments, that she heard voices, and that she lashed out at others during bad moods. (R. 17). The ALJ acknowledged Plaintiff's description of the help she needs from her mother regarding appointments and of the daily activities Plaintiff can do. (R. 17-18). The ALJ also correctly noted Plaintiff's testimony that she had no issues with maintaining a checkbook, reading, or writing. (R. 17). Throughout the decision, the ALJ compares Plaintiff's daily activities and description of symptoms to her subjective symptoms and treatment and explains how treatment records support the RFC. For example, in discussing the medical record, the ALJ notes that Plaintiff's result after her first hospitalization suggested that Plaintiff could work under the mental health limitations of the RFC (R. 20); that Plaintiff's symptoms at follow-up appointment with Dr. Lauterbach did not conflict with the RFC (R. 21); and that the mental health notes from Community Health did not preclude Plaintiff from all work. (R. 22). The ALJ ultimately found that the subjective symptoms described were not consistent with the objective medical record.  This decision is well articulated,

---

records cited by the ALJ do not relate to Plaintiff but to another patient not involved in this case. (R. 46-47, 388-393).

and it shows the ALJ considered the record as a whole. There is no error with the manner in which the ALJ considered the severity, limitations, and treatment of Plaintiff's mental health issues.

Plaintiff argues that the ALJ's failure to consider her mental health records resulted in an incomplete RFC, which requires remand of Plaintiff's case. As discussed above, the ALJ appropriately considered Plaintiff's mental health limitations and symptoms based on the record. The case on which Plaintiff chiefly relies, *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245 (11th Cir 2019), is distinguishable from Plaintiff's case. First, unlike in *Schink*, in this case the ALJ did classify Plaintiff's mental health impairments as severe. Next, the ALJ accounted for the limitations in the RFC that she found supported by the record. The ALJ's questioning of the VE indicates that the ALJ incorporated the record-supported limitations, such as restricting interaction with the public, minimizing interaction with co-workers, and limiting work to simple, routine, unskilled tasks. (R. 66-67) The ALJ also posed additional limitations to the VE in the second hypothetical (R. 67-68), but ultimately the ALJ did not find these limitations supported by the record. The ALJ has the responsibility to assess the RFC. 20 C.FR. § 404.1546(c). In doing so, an ALJ is not required to include limitations in the RFC which she rejects as not supported by the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Here, the ALJ's reasoning for the RFC is clearly articulated with citations to the relevant record. As noted above, the ALJ specifically referenced the relevant portions of the RFC for nearly each record she discussed and explained how or why the limitations were supported. (R. 16-27).

The ALJ clearly articulated an analysis of the objective treatment record sufficient to establish substantial evidence in support of the decision and to discount Plaintiff's subjective statements of severity. *See Brown v. Comm'r of Soc. Sec.*, 677 F. App'x 529, 531-532 (11th Cir. 2017). Ultimately, Plaintiff is asking the Court to reweigh the evidence, which this court cannot

do. *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1314 (11th Cir. 2021) (citing *Winschel*, 631 F.3d at 1178). There is no error in the ALJ's discussion of Plaintiff's mental health records, and the limitations included in the RFC are supported by substantial evidence.

2.  The ALJ properly evaluated whether Plaintiff met Listing 12.03.

Plaintiff argues that ALJ failed to evaluate Plaintiff under any listing, and suggests that she meets Listing 12.03. (Doc.17, p. 8-9). Contrary to Plaintiff's assertion, the ALJ did consider Listing 12.03, by considering the limitations posed by Plaintiff's mental health under paragraphs B and C of Listings 12.03, 12.04, 12.06, and 12.08, where applicable (R. 14-16), but ultimately found that "[t]he severity of Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria…."

Listing 12.03 states as follows:

12.03 *Schizophrenia spectrum and other psychotic disorders* (see 12.00B2), satisfied by A and B or A and C:

A. Medical documentation of *one* or more of the following:
1. Delusions or hallucinations;
2. Disorganized thinking (speech); or
3. Gross disorganized behavior or catatonia.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
1. Understand, remember, or apply information (see 12.00E1).
2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4)

OR

C. Your mental disorder in this listing in "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of a least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); *and*
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. pt. 404, subpt. P. app. 1, § 12.03 (emphasis in original).

Plaintiff's argument attempts to highlight that she meets Paragraph A. (Doc. 17, p. 8-9). The ALJ's decision does not suggest, however, that Plaintiff does not meet Paragraph A. Instead, the ALJ correctly recognized that Plaintiff must also meet Paragraph B or C in addition to Paragraph A. The ALJ did not find that Plaintiff met either of these paragraphs, and accordingly found that Plaintiff did not meet a Listing impairment.

Under Listing 12.03, Plaintiff could meet the parameters of Paragraph B, either by having one extreme limitation or two marked limitations. The ALJ thoroughly discussed the parameters in paragraph B and supported her findings by citing to the record. (R. 14-15). The ALJ found that Plaintiff had moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; and concentrating, persisting, and maintaining pace. (*Id.*) Regarding the final area, adapting and managing oneself, the ALJ found that Plaintiff had only a mild limitation. (*Id.*) The ALJ then reviewed the paraments of Paragraph C. She found that the evidence reflected that Plaintiff met the duration requirement but did not show that Plaintiff met the remaining parameters. (R. 15-16). Therefore, Plaintiff did not meet the requirements of Listing 12.03. (R. 15).

Contrary to Plaintiff's argument, the ALJ thoroughly considered whether Plaintiff met a Listing impairment, including Listing 12.03. Plaintiff has not shown that she meets the listing requirement and there is substantial evidence to support the ALJs finding that Plaintiff did not.

There was no error in the ALJ's evaluation of Plaintiff's condition at step three of the disability evaluation.

3. <u>The ALJ appropriately found that jobs existed in the national economy based upon the vocational expert's testimony and the record.</u>

Plaintiff's final argument alleges that the ALJ only relied on the national availability of representative jobs suggested by the vocational expert (VE) and failed to consider the numbers of jobs regionally available. (Doc. 17, p. 10). This argument is unpersuasive and does not support remanding Plaintiff's case.

The VE testified that Plaintiff would be able to perform the jobs of (1) production assembler (273,000 available jobs in the national economy); (2) electronic worker (143,000 available jobs in the national economy); and (3) hand packager, inspector (123,000 available jobs in the national economy). (R. 29, 67). Plaintiff, who was represented by counsel, did not object to the VE's qualifications, did not question the VE's methodology at the hearing, and only cross-examined the VE with additional hypothetical RFC limitations. (R. 65, 68-69). Now Plaintiff suggests that the jobs numbers are flawed or unsupported on a regional level. The record does not support this argument, and the only evidence in the record is that numerous jobs are available to Plaintiff.

A similar argument was rejected by the Eleventh Circuit in *Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315 (11th Cir. 2021). In *Bacon,* the claimant argued that the VE's testimony should be rejected because other evidence, which was absent from the record, may show that fewer than 325,000 cleaner and polisher jobs existed. The *Bacon* claimant did not challenge the VE or question the methodology at the hearing before the ALJ, setting it apart from a reported case[4] in which the jobs numbers were unsupported in the record. *Bacon*, 861 F. App'x at 320. *Bacon* also

---

[4] *Goode v. Comm'r of Soc Security*, 966 F.3d 1277 (11th Cir. 2020).

recognized that the Eleventh Circuit has found "as few as 80,000 jobs nationally constituted a significant number." *Id*. at 321 (citing *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir 1987)). Here, like in *Bacon*, the VE's testimony "was neither clearly and unmistakably wrong on its face, nor was it internally inconsistent and incomplete." *Bacon*, 861 F. App'x at 320. Thus, the ALJ appropriately and adequately relied on the VE's testimony to find jobs existed in the national economy which Plaintiff can perform under the assessed RFC. *See* 20 C.F.R. §§ 404.1560(c), 404.1566(a), 416.960(c), 416.966(a). Substantial evidence supports the ALJ's conclusions.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 3rd day of March, 2023.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge